Josoph **HENRY**, Petitioner,

v.

Martin **HORN**, Commissioner, Pennsylvania Department of Corrections; James S. Price, Superintendent of the State Correctional Institution at Green, and Joseph P. Mazurkiewicz, Superintendent of the State Correctional Institution at Rockview, Respondents.

No. 98–CV–2187.

United States District Court,
E.D. Pennsylvania.

May 16, 2002.

Robert Brett Dunham, Yvonne Bradley, Billy H. Nolas, Matthew Lawry, Defender's Assoc., Philadelphia, PA, for plaintiff.

John M. Morganelli, Office of the DA for Northampton Co., Easton, PA, for defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Josoph Henry ("Henry" or "petitioner") brings this petition for writ of habeas corpus, challenging his conviction for first-degree murder and the sentence of death that was imposed. Henry asserts fourteen claims of constitutional error in the guilt and sentencing phases of his trial. I will deny the petition with regard to each claim challenging Henry's conviction of first-degree murder. I will, however, grant the writ of habeas corpus with regard to Claim I, alleging error in the death penalty phase of Henry's trial.

I recognize that certain provisions of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") greatly restricted the scope of federal habeas review of state criminal convictions. In this instance, however, the line of cases that includes the United States Supreme Court decisions in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and the recent decision of the Third Circuit in *Banks v. Horn*, 271 F.3d 527 (2001), compels the conclusion that the Pennsylvania Supreme Court unreasonably applied "clearly established Federal law" in upholding Henry's sentence of death. *See* 28 U.S.C. § 2254(d)(1). Reviewing the jury instructions and verdict slip used in the penalty phase of Henry's trial, I conclude that they created a "reasonable likelihood that the jury has applied the challenged instructions in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. Therefore, the sentence of death must be vacated and the case remanded for the Commonwealth of Pennsylvania to sentence Henry to life imprisonment, or to conduct such further proceedings as may be appropriate under state law.

## Background

In the early morning hours of April 5, 1986, Henry entered the dormitory room of a fellow Lehigh University student, Jeanne Ann Clery ("Clery"). While Henry was in the process of burglarizing the room, Clery woke up. In order to prevent Clery from identifying him, Henry attacked and eventually killed her. Clery sustained multiple cuts to her neck, bites on her face and breasts, and bruises over much of her body. Henry also raped and sodomized Clery before manually strangling her to death. Henry stole numerous items belonging to Clery and her roommate, which were found in Henry's room in the house where he lived. Henry admitted his role in Clery's death to several of his friends and roommates.

Henry raised several issues in pre-trial motions, including a challenge to the selection of a petit jury from Lancaster County due to the composition of the jury venire. On April 6, 1987, the trial judge issued an opinion, denying Henry's challenge to the selection of a petit jury drawn from Lancaster County.

At trial, Henry did not challenge the factual basis of the charges, instead attempting to defend himself by raising an insanity defense. However, following the testimony of several psychiatrists for both the prosecution and the defense, the trial judge granted the Commonwealth's demurrer and removed the issue of insanity from the jury. On April 25, 1987, the jury convicted Henry of first-degree murder, rape, involuntary deviate sexual intercourse, indecent assault, burglary, theft, robbery and aggravated assault. Following a three-day penalty hearing, the jury sentenced Henry to death.

After the trial, Henry filed post-verdict motions for a new trial and in arrest of judgment, which the trial judge denied in an opinion filed on June 30, 1988. The

Pennsylvania Supreme Court reviewed the first-degree murder conviction and death sentence on direct appeal, denying relief on all claims and finding that the death sentence was proportional. *See Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929 (1990) (hereinafter *"Henry I"*). After the United States Supreme Court denied certiorari, Henry proceeded to file a petition for relief pursuant to the Post Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.* ("PCRA"). The Court of Common Pleas held a four-day evidentiary hearing in January 1996 and denied Henry's PCRA petition in an order issued on January 31, 1996. The Pennsylvania Supreme Court affirmed the denial of PCRA relief in an opinion issued on December 23, 1997. *See Commonwealth v. Henry*, 550 Pa. 346, 706 A.2d 313 (1997) (hereinafter *"Henry II"*).

On April 24, 1998, Henry filed a motion for leave to proceed in forma pauperis and for appointment of counsel, which I granted on April 28, 1998. Henry filed his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on April 2, 1999. On July 12, 1999, Henry filed a consolidated memorandum of law in support of this petition. In these filings, Henry raises fourteen claims attacking the validity of his conviction and sentence of death:

1. Petitioner's death sentence was obtained in violation of the Sixth, Eighth and Fourteenth Amendments because the jury instructions and verdict slip may have led the jury to believe that it had to unanimously agree to the existence of mitigating circumstances in order to consider them in weighing the appropriate sentence for Henry, in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

2. Petitioner's death sentence was obtained in violation of the Sixth, Eighth and Fourteenth Amendments because the trial court excluded relevant mitigating evidence from the penalty phase of petitioner's trial.

3. Petitioner's conviction and death sentence were obtained in violation of the Sixth and Fourteenth Amendments because his petit jury was drawn from a venire that did not include a fair-cross-section of the community.

4. Petitioner's death sentence was obtained in violation of the Sixth, Eighth and Fourteenth Amendments because he received ineffective assistance of counsel at the penalty phase of his trial.

5. Petitioner's conviction and death sentence were obtained in violation of the Sixth, Eighth and Fourteenth Amendments because he failed to receive competent psychiatric assistance and his attorney was ineffective for failing to ensure that he received such assistance.

6. Petitioner's conviction and death sentence were obtained in violation of his constitutional rights because his attorney was ineffective for failing to ensure through voir dire questioning that he was tried by a fair and impartial jury.

7. Petitioner's conviction and death sentence were obtained in violation of his constitutional rights because the Commonwealth knowingly presented false testimony during the guilt and penalty phases of his trial.

8. Petitioner's conviction and death sentence were obtained in violation of his constitutional right because his trial attorney was ineffective for failing to protect petitioner from discovery violations by the Commonwealth and for failing to adequately cross-examine and rebut testimony by Commonwealth witnesses.

9. Petitioner's conviction and death sentence were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments because the Commonwealth deliberately elicited incriminating statements from petitioner through an informant serving as a government agent.

10. Petitioner's conviction and death sentence were obtained in violation of his constitutional rights because of the prosecutor's improper remarks in his closing statements at both the guilt and penalty phases and due to the ineffective assistance of his trial attorney in failing to properly object to those remarks.

11. Petitioner's death sentence was obtained in violation of his constitutional rights because it was based upon an unconstitutional application of the (D)(5) "witness elimination" aggravating circumstance.

12. Petitioner's death sentence was obtained in violation of the Eighth and Fourteenth Amendments because it was based upon an invalid finding of the (D)(8) "torture" aggravating circumstance.

13. Petitioner's conviction and death sentence were obtained in violation of his constitutional rights because he was denied meaningful appellate review of his conviction and sentence when the Pennsylvania Supreme Court denied his claim that gruesome and inflammatory photographs were improperly admitted at trial without examining the photographs, and also when it conducted an inadequate and unconstitutional proportionality review.

14. Petitioner's death sentence was obtained in violation of the Sixth, Eighth and Fourteenth Amendments because the trial court improperly failed to instruct the sentencing jury that, if petitioner was sentenced to life imprisonment, he would be ineligible for parole.

*See* Petition for Writ of Habeas Corpus, at i–iv.

### Application of AEDPA

On April 24, 1996, the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") came into effect. AEDPA amended the federal habeas statutes, codifying limitations on the conditions under which the federal courts may grant either a writ of habeas corpus or an evidentiary hearing on a petition for such a writ. *See Michael Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (hereinafter *Michael Williams*); *Terry Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (hereinafter *Terry Williams*); *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir.2000); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir.2000). Henry brings his habeas petition pursuant to 28 U.S.C. § 2254, which permits federal court review of petitions brought by persons in custody pursuant to a state court judgment and based upon one or more alleged violations of federal law. *See* 28 U.S.C. § 2254(a).

### Exhaustion and Procedural Default

In order for a federal court to reach the merits of a § 2254 petition, certain threshold requirements must be satisfied. Two of these requirements, with respect to each claim in the petition, are that (1) petitioner has exhausted available state court remedies and (2) the claim has not been procedurally defaulted. *See* 28 U.S.C. § 2254(b)(1)(A); *Coleman v. Thompson*, 501 U.S. 722, 729–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

The exhaustion requirement prohibits federal courts from considering a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C.

§ 2254(b)(1)(A). In order to exhaust the available state court remedies for a federal claim, a petitioner must fairly present it in front of the highest available state court, including those courts to which appeal is discretionary. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 847–48, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). To "fairly present" a federal claim, a petitioner must present its "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *See McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir.1999) (*citing Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Picard v. Connor,* 404 U.S. 270, 277–78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Where a petitioner has failed to exhaust all of the claims in his federal habeas petition, the federal habeas court generally must dismiss the petition, permitting the petitioner to return to the state courts and exhaust any unexhausted claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Lambert v. Blackwell,* 134 F.3d 506, 509 (3d Cir.1997). Under the "futility exception" to the exhaustion requirement, if state procedural rules bar the applicant from seeking further relief on the unexhausted claims in the state courts, the exhaustion requirement is satisfied because there is "an absence of available State corrective process." 28 U.S.C. § 2254(b). *See Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Lines v. Larkins,* 208 F.3d 153, 165–66 (3d Cir.2000). However, when the futility exception applies, the claim is considered to be procedurally defaulted and may only be reached by federal courts if petitioner makes the standard showing of "cause and prejudice" or establishes a fundamental miscarriage of justice. *See Lines,* 208 F.3d at 166.

■ The doctrine of procedural default establishes that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance" and therefore, as a matter of comity and federalism, generally cannot proceed with those claims in the federal courts. *Coleman,* 501 U.S. at 732, 111 S.Ct. 2546. A federal court may excuse procedural default and consider a claim on the merits if the petitioner can demonstrate either "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that failure to consider the claim will result in a "fundamental miscarriage of justice." *Id.* at 750, 111 S.Ct. 2546. Whether a demonstration of cause is sufficient to excuse procedural default "ordinarily turn[s] on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

Henry brings fourteen claims in his federal habeas petition, some of which contain several assignments of error by the Pennsylvania state courts. He asserts that each of these claims has been fully litigated in the state courts and therefore, that no issues of exhaustion or procedural default prevent me from reaching the merits of each claim. The Commonwealth concurs that petitioner has exhausted his state remedies, *see* Answer to the Petition for Writ of Habeas Corpus, at 1, and has not raised the issue of procedural default. After reviewing the briefs of the parties and the various opinions of the Pennsylvania state courts, I conclude that, with one exception, all of Henry's claims are exhausted and not procedurally defaulted. The single exception is the portion of Claim III wherein Henry challenges the exclusion of persons identifying themselves as Amish and Mennonite from the jury venire in Lancaster County as a violation of *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58

L.Ed.2d 579 (1979). I shall discuss the application of the exhaustion and procedural default standards to this claim in the portion of this opinion addressing Claim III.

**Review of Claims Under Section 2254(d)(1)**

Henry's federal habeas petition seeks relief pursuant to 28 U.S.C. § 2254. With regard to the proper standard of review of claims in a § 2254 petition, the statute provides, in pertinent part, that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C.A. § 2254(d)(1) (West Supp.2001). AEDPA heightens the deference that federal courts must give to the factual findings and legal determinations of the state courts whose decision they are reviewing. *See Werts v. Vaughn,* 228 F.3d at 196.

■ In *Terry Williams,* the Supreme Court addressed the interpretation of 2254(d)(1). As an initial point, "[t]he threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Court found that if a rule of law would qualify as an old rule under its *Teague*[1] jurisprudence, it is clearly established for the purposes of ADEPA, so long as it is the "holdings, as opposed to the dicta, of [the Supreme] Court." 529 U.S. at 412, 120 S.Ct. 1495.

■ The *Terry Williams* Court next discussed the distinction between the "contrary to" and "unreasonable application of" prongs, instructing that these clauses must be accorded independent meaning. *See Terry Williams,* 529 U.S. at 405, 120 S.Ct. 1495. The Court held that a state court decision is "contrary to" clearly established Federal law if (1) the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases, *id.* at 405, 120 S.Ct. 1495, or (2) if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from the Court's precedent. *Id.* at 406, 120 S.Ct. 1495. The Court distinguished such situations, where "contrary to" analysis is appropriate, from "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case." *Id.* at 406, 120 S.Ct. 1495. It found that applying "contrary to" analysis to such a situation would be "suspect given the logical and natural fit of the neighboring 'unreasonable application' clause to such cases." *Id.* at 407, 120 S.Ct. 1495. The Court noted that an unreasonable application of Supreme Court jurisprudence would exist if the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular case, or if a state court decision extends a legal principle gleaned

---

**1.** In *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), a plurality of the Supreme Court adopted a new approach to the retroactive application of newly announced legal rules in habeas corpus proceedings. Central to the *Teague* doctrine is the distinction between an "old rule," to which retroactivity concerns do not apply, and a "new rule," which, with two exceptions, may not be enforced by a habeas petitioner if it was announced after his conviction became final. *See O'Dell v. Netherland,* 521 U.S. 151, 156–57, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997).

from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend such a principle to a new context where it should apply. *See Terry Williams,* 529 U.S. at 407, 120 S.Ct. 1495. The Court emphasized that the federal court should ask whether the state court decision was an "objectively unreasonable" application of clearly established Federal law. *Id.* at 409, 120 S.Ct. 1495. Also, an unreasonable application is different from an incorrect application. *Id.* at 410, 120 S.Ct. 1495. Finally, in determining whether the state court's application of Supreme Court precedent was unreasonable, habeas courts may consider the decisions of inferior federal courts. *See Matteo v. Superintendent,* 171 F.3d 877, 890 (3d Cir.1999).

### Granting an Evidentiary Hearing

The purpose of a federal evidentiary hearing is to ensure that a petitioner has a full and fair opportunity to have the factual basis of his claim considered. *See Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The AEDPA has limited the availability of evidentiary hearings on federal habeas review. *See generally, Campbell v. Vaughn,* 209 F.3d 280, 286 (3d Cir.2000). The relevant provision of § 2254(e) provides:

(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).

The initial inquiry under § 2254(e) is whether the factual basis was developed in the state court, which is "a question susceptible, in the normal course, of a simple yes or no answer." *Michael Williams,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). If the factual basis was developed, either implicitly or explicitly, then the federal habeas court must apply the presumption of correctness codified in § 2254(e)(1), which a petitioner can only rebut with clear and convincing evidence. *See Parke v. Raley,* 506 U.S. 20, 35, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992); *Campbell,* 209 F.3d at 285–86.

If the factual basis was not developed, then the federal habeas court must determine whether the petitioner failed to develop the factual basis of his claim. *See* 28 U.S.C. § 2254(e)(2). The Supreme Court has held that "[i]n its customary and preferred sense, 'fail' connotes some omission, fault, or negligence on the part of the person who has failed to do something." *Michael Williams,* 529 U.S. at 431, 120 S.Ct. 1479. In determining whether petitioner failed to develop the state court record, "[t]he question is not whether the facts could have been discovered but instead whether the petitioner was diligent in his efforts ... Diligence for purposes of

the opening clause [of § 2254(e)(2) ] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435, 120 S.Ct. 1479. If the district court concludes that the petitioner failed to develop the record in state court, an evidentiary hearing is barred unless the petitioner can meet the stringent standard of § 2254(e)(2)(A) and (B).

■ If the federal habeas court determines that petitioner did not "fail" to develop the state court record, then the decision about whether to hold an evidentiary hearing is left to the discretion of the habeas court. *See Campbell,* 209 F.3d at 286–87. In exercising its discretion, the court should "focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell,* 209 F.3d at 287.

### General Ineffective Assistance of Counsel Standard

■ Several of Henry's claims allege ineffective assistance of counsel by his trial counsel, J. Michael Farrell. Claims of ineffective assistance are analyzed under the two-part test articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to merit habeas relief due to the ineffectiveness of counsel, petitioner must establish that (1) counsel's performance fell well below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *See id.* at 687, 104 S.Ct. 2052. Counsel is presumed to be effective and petitioner bears the burden of "overcom[ing] the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 686–89, 104 S.Ct. 2052. Strickland estab-

lishes a demanding standard of ineffectiveness that requires petitioner to prove the "gross incompetence" of his counsel. *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Where counsel failed to raise a meritless claim, relief under *Strickland* is not available. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Holland v. Horn,* 150 F.Supp.2d 706, 770 (E.D.Pa.2001); *Holloway v. Horn,* 161 F.Supp.2d 452, 583–84 (E.D.Pa.2001).

■ The Pennsylvania Supreme Court has developed an ineffective assistance standard that requires petitioner to demonstrate that (1) the underlying claim is of arguable merit, (2) counsel had no reasonable basis for the act or omission in question, and (3) but for counsel's act or omission, the outcome of the proceedings would have been different. *See Commonwealth v. Douglas,* 537 Pa. 588, 645 A.2d 226, 230–31 (1994); *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987). This standard has been found to be materially identical to the test enunciated in *Strickland. See Werts v. Vaughn,* 228 F.3d 178, 203 (3d Cir.2000). The Third Circuit has ruled that this standard is not "contrary to" *Strickland,* and therefore, "the appropriate inquiry is whether the Pennsylvania courts' application of *Strickland* to [petitioner's] ineffectiveness claim was objectively unreasonable, *i.e.,* the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under *Strickland.*" *Werts,* 228 F.3d at 204.

### Discussion

Henry brings fourteen claims in this petition, several of which involve multiple sub-claims. In his first claim, Henry contends that the jury instructions and verdict sheet, when taken together, combined to create a "reasonable likelihood that the

jury has applied the ... instructions in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. at 380, 110 S.Ct. 1190. In light of the Supreme Court's holdings in *Boyde* and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384, and that of the Third Circuit in *Banks v. Horn,* 271 F.3d 527, I conclude that Henry's first claim is meritorious. Therefore, the petition shall be granted with regard to this claim and Henry's death sentence shall be vacated. Claims II, IV, XI, XII and XIV allege constitutional error solely in the sentencing phase of the trial. These claims are rendered moot by my resolution of the first claim and will not be discussed. Claims III, V, VI, VII, VIII, IX, X and XIII attack both the guilt and penalty phases of Henry's trial. I shall only address these claims to the extent that they assert error at the guilt phase.

### Claim I

Petitioner first challenges the trial court's jury instructions and verdict sheet. He claims that their use was unconstitutional because, taken together, they may have led the jury to conclude that it was precluded from considering certain mitigating evidence. Specifically, Henry asserts that the instructions and the verdict slip may have led the jury to believe that it had to unanimously agree to the existence of mitigating circumstances in order to consider them in weighing the appropriate sentence for Henry, in violation of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384.

As a threshold issue, for petitioner to assert a colorable claim on habeas, he must allege that the state court failed to properly apply "clearly established Federal law, as declared by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Third Circuit has held that "the point in time at which the Supreme Court jurisprudence must have

been 'clearly established' is at the time that the state court makes the ruling on the federal constitutional issue that is being scrutinized." *Banks,* 271 F.3d at 541. The Pennsylvania Supreme Court issued its PCRA petition, addressing Henry's *Mills* claim, in 1997, nearly ten years after *Mills* was decided and seven years after the Supreme Court modified the *Mills* standard in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Therefore, both *Mills* and *Boyde* constitute "clearly established Federal law" for the purposes of § 2254(d).

The next issue is whether the Pennsylvania Supreme Court's determination should be analyzed under the "contrary to" or the "unreasonable application" prong of 2254(d)(1). The United States Supreme Court limited "contrary to" analysis to situations where the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases, or where the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from the Court's precedent. *See Terry Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. In this case, the Pennsylvania Supreme Court recognized that *Mills* was the appropriate source of law with regard to petitioner's claim. *See Henry,* 706 A.2d at 332. The court then found that "the jury instructions and verdict slip here, however, do not contain the language or form that was cause for concern in *Mills.*" *Id.* As the Pennsylvania Supreme Court's referred to *Mills* and attempted to apply it to the facts of Henry's case, "contrary to" analysis is not appropriate. *See Banks v. Horn,* 271 F.3d at 545 n. 21. The Pennsylvania Supreme Court's determination appears to be "a run-of-the-mill state-court decision applying the correct legal rule from [United States Supreme Court] cases to the facts of a prisoner's case." *Terry*

*Williams,* 529 U.S. at 406, 120 S.Ct. 1495. Therefore, the proper inquiry is whether the Pennsylvania Supreme Court's analysis of the effect of the jury instructions and verdict slip on the jury's consideration of mitigating evidence was an objectively unreasonable application of *Mills* and *Boyde.* *Id.* at 409, 120 S.Ct. 1495.

■ In addressing Henry's *Mills* claim, the Pennsylvania Supreme Court found that both the jury instructions and the verdict slip used at his sentencing were substantially similar to ones it had previously found not to violate *Mills.* It stated that,

> [i]ndeed, this Court reviewed jury instructions substantially similar to those here in *Commonwealth v. Banks,* 540 Pa. 143, 656 A.2d 467 (1995), and *Commonwealth v. Wilson,* 649 A.2d 435 (1994), and found no violation of *Mills.* In [Commonwealth v.] *Frey*[, 520 Pa. 338, 554 A.2d 27 (1989)], we reviewed a verdict slip substantially similar to the slip here and concluded that there was no violation of *Mills.*

*Henry II,* 706 A.2d at 332. The Pennsylvania Supreme Court's reliance on its own precedents, however, is not sufficient to render its application of *Mills* objectively reasonable. As the Third Circuit has noted, the task of a federal habeas court is "to review state court proceedings not to ensure the consistency of the Pennsylvania Supreme Court's application of its law, but, rather, to assure proper application of United States Supreme Court teachings." *Banks,* 271 F.3d at 544.

In *Mills,* the Supreme Court vacated a sentence of death on the ground that there was a substantial probability that reasonable jurors might have construed the jury instructions such that they were precluded from considering any particular piece of mitigating evidence unless they unanimously agreed on its existence. *See Mills,* 486 U.S. at 384, 108 S.Ct. 1860. The Court

emphasized that the critical question in this area is not whether a constitutional construction is possible, but whether a reasonable jury could have interpreted the instructions in an unconstitutional manner. *See id.* at 375–76, 108 S.Ct. 1860. In *Boyde,* the Court sought to clarify what it observed as having become an unclear legal standard. *See Boyde,* 494 U.S. at 378, 110 S.Ct. 1190. The Court emphasized that the proper inquiry focuses on the reasonable likelihood that the entire jury, rather than individual jurors, applied the instruction in an improper manner. *See id.* at 380, 110 S.Ct. 1190. In deciding this issue, the court must analyze both the jury instructions and the verdict slip, *see Mills,* 486 U.S. at 375–76, 108 S.Ct. 1860, and in reviewing any particular jury instruction, must consider it in the context of the entire charge. *See Boyde,* 494 U.S. at 378, 110 S.Ct. 1190.

In determining whether the state court's application of Supreme Court precedent was unreasonable, habeas courts may consider the decisions of inferior federal courts. *See Matteo v. Superintendent,* 171 F.3d 877, 890 (3d Cir.1999). The recent decision of the Third Circuit in *Banks v. Horn* virtually compels the conclusion that the Pennsylvania Supreme Court's opinion involved an unreasonable application of *Mills.* In *Banks,* the Third Circuit reviewed a Pennsylvania Supreme Court determination that, based upon its past decisions, no *Mills* violation had occurred. *See Banks,* 271 F.3d at 544. In its PCRA review, the Pennsylvania Supreme Court examined the jury instructions and the verdict slip utilized in Banks' sentencing and concluded that, as they were substantially similar to ones that it had previously found constitutional, there was no violation. *See Commonwealth v. Banks,* 540 Pa. 143, 656 A.2d 467, 470 (1995). The precedents that the Pennsylvania Supreme Court relied on to make this determination

essentially concluded that the jury instruction was constitutional because it quoted from the language in the death penalty statute. *See id.* On habeas review, the Third Circuit concluded that, in deciding the issue in this manner, "the Pennsylvania Supreme Court ruled that there was no *Mills* violation without ever really applying the teachings of *Mills.*" *Banks,* 271 F.3d at 545. It concluded that this constituted an unreasonable application of *Mills. See id.*

In Henry's case, the Pennsylvania Supreme Court conducted an almost identical analysis, holding that

> the jury instructions ... do not contain the language or form that was cause for concern in *Mills.* Indeed, this Court reviewed jury instructions substantially similar to those here in *Commonwealth v. Banks,* 540 Pa. 143, 656 A.2d 467 (1995), and *Commonwealth v. Wilson,* 649 A.2d 435 (1994), and found no violation of *Mills.* In *Frey,* we reviewed a verdict slip substantially similar to the slip here and concluded that there was no violation of *Mills.*

*Henry II,* 706 A.2d at 332. By simply relying on its precedents of *Commonwealth v. Banks* and *Commonwealth v. Frey,* and failing to examine the effect of the jury instructions and verdict slip upon the jury in Henry's sentencing trial, the Pennsylvania Supreme Court failed to apply the teachings of *Mills.* A review of the Pennsylvania Supreme Court's analysis of both the jury instructions and the verdict slip demonstrates that it unreasonably applied *Mills* to Henry's case.

## A. Jury Instructions

In applying *Mills,* the reviewing court is required to "examine the entire jury instructions, posing the 'critical question' whether a reasonable jury would have concluded from the instruction that unanimity was required to find a mitigating circumstance." *Banks,* 271 F.3d at 546 (*citing*

*Mills,* 486 U.S. at 370 108 S.Ct. 1860). When the court reviews any particular jury instruction, it must view it in the context of the entire charge. *See Boyde,* 494 U.S. at 378, 110 S.Ct. 1190. In *Banks,* the Third Circuit noted that the Pennsylvania Supreme Court had simply quoted three lines of the jury instructions in support of its conclusion that the instructions did not violate *Mills.* 271 F.3d at 546. It found that this was not the proper analysis of jury instructions mandated by *Boyde. Id.* Therefore, the Third Circuit examined the entire *Banks* jury instructions to determine whether they were constitutionally defective.

The Pennsylvania Supreme Court applied a similarly flawed analysis to the jury instructions used at Henry's sentencing proceeding. In its PCRA opinion, the Pennsylvania Supreme Court failed to quote any of the jury instructions, only mentioning them in its conclusory statement that "the jury instructions ... do not contain the language or form that was cause for concern in *Mills.* Indeed, this Court reviewed jury instructions substantially similar to those here in *Commonwealth v. Banks,* 540 Pa. 143, 656 A.2d 467 (1995), and *Commonwealth v. Wilson,* 538 Pa. 485, 649 A.2d 435 (1994), and found no violation of *Mills.*" *Henry II,* 706 A.2d at 332. A comparison of the *Henry* jury instructions to those used in *Banks* reveals that they are similarly defective.

The jury instructions given in Henry's sentencing proceeding closely track those given in the *Banks* sentencing. The judge at Henry's sentencing stated, in relevant part:

> Members of the jury ... you must now decide whether the defendant is to be sentenced to death or life imprisonment. And the sentence will depend upon your findings concerning aggravating and

mitigating circumstances. N.T. April 28, 1987, at 91.

The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances ... Unless you are able to support findings within those two ranges for the death penalty, the verdict must be a sentence of life imprisonment in all other cases. N.T. April 28, 1987, at 92

[T]he Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt; the defendant has the burden of proving mitigating circumstances, but only by a preponderance of the evidence. N.T. April 28, 1987, at 98–99.

[I]f you were to find a unanimous lawful verdict that required you to make a recording after (b) on the same line on Page 2, that is a finding that you found that the Commonwealth convinced you beyond a reasonable doubt that aggravating circumstance (B) as set forth on the top of Page 3 is found ... The same process will be involved with the mitigating circumstances. N.T. April 28, 1987, at 106.

These excerpts from the Henry jury instructions are virtually identical to the jury instructions in *Banks*. *See* 271 F.3d at 546.

Analyzing the jury instructions in *Banks*, the Third Circuit identified two elements that created a reasonable likelihood that the jury could have understood the charge to require unanimity in consideration of mitigating evidence. *See id.* at 547–48. First, the relevant portion of the jury instructions emphasized the importance of a unanimous finding in close proximity—within seven words—of the mitigat-

ing circumstances clause. *See id.* The Third Circuit found that this created a sound bite that was likely to stick in the minds of jurors and convince them that they had to find mitigating circumstances unanimously. *See id.* at 548. Second, the *Banks* court noted that the instructions emphasized the difference between the relevant burdens of proof relating to aggravating and mitigating circumstances, but remained silent with regard to the different unanimity requirements. *See id.* This rendered the instructions ambiguous, permitting the jury to infer that the unanimity requirement applied to both the aggravating and mitigating circumstances. *See id.*

The jury instructions given in Henry's sentencing proceeding contain both of the defects identified by the Third Circuit in *Banks*. An early portion of the instructions contains two repetitions of the "unanimously finds" sound bite in close proximity to the mitigating circumstances clause. The court also emphasized the different burdens of proof relating to aggravating and mitigating circumstances, but never mentioned the different unanimity requirements. Additionally, at several points in the jury charge, the court commented on the similar processes of finding aggravating and mitigating circumstances. *See e.g.*, N.T. at 106. These statements increased the likelihood of the jury inferring that the unanimity requirement applied to both aggravating and mitigating circumstances. Evaluated as a whole, the jury instructions leave little doubt that "there is a reasonable likelihood that the jury has applied the challenged instructions in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190.

### B. Verdict Slip

The reviewing court is required to assess whether a need for a unanimous find-

ing of mitigating circumstances is one that "a reasonable jury could have drawn from ... the verdict form employed." *Mills,* 486 U.S. at 375–76, 108 S.Ct. 1860; *Banks,* 271 F.3d at 549. In *Banks,* the Third Circuit held that the Pennsylvania Supreme Court unreasonably applied *Mills* when it failed to examine the verdict slip utilized and the likelihood that it suggested a need for unanimity to the jury. *See Banks,* 271 F.3d at 549. The Third Circuit found that the Pennsylvania Supreme Court's reliance upon its prior ruling in *Commonwealth v. Frey* that a similar verdict slip was constitutional, was not a proper inquiry under *Mills. See id.* It then examined both the form and structure of the verdict slip, which it found to suggest a need for unanimity among the jury in finding mitigating factors. *See id.* The Third Circuit focused upon the lead-in language to the second section of the verdict slip, where the jury had to record the aggravating and mitigating factors. It found that the phrase "We the jury have found unanimously," created a strong impression that mitigating circumstances needed to be found unanimously. *Banks,* 271 F.3d at 550. Additionally, the verdict slip failed to indicate how the jury might record a mitigating circumstance found by less than all of the jurors. *See id.*

The Pennsylvania Supreme Court held that the verdict slip used in Henry's sentencing proceeding did not violate *Mills* because, "In *Frey,* we reviewed a verdict slip substantially similar to the slip here and concluded that there was no violation of *Mills." Henry,* 706 A.2d at 332. This is the precise approach that the Third Circuit held to be an unreasonable application of *Mills. See Banks,* 271 F.3d at 549. The verdict slip used in Henry's sentencing proceeding supports this conclusion, as it was functionally identical to the *Banks* verdict slip. The introductory portion of Section IV of the Henry verdict slip, where the jury found both aggravating and miti-

gating circumstances and weighed them, contained the phrase, "we the jury have found unanimously." This language implies that everything that followed was found unanimously. *See Banks,* 271 F.3d at 550. The form then provided a list for the jury to check off each of the aggravating and mitigating circumstances that it found. Nothing on the form indicated that a mitigating factor could be checked off if the jury failed to unanimously find that it existed. The overwhelming impression created by this verdict slip is that mitigating circumstances had to be found unanimously by the jury to be considered in weighing the appropriate sentence. The verdict slip violated the principle of *Mills* and the Pennsylvania Supreme Court unreasonably applied *Mills* by failing to examine the verdict slip and assess whether it could have led a reasonable jury to believe that mitigating circumstances needed to be found unanimously.

### C. *Mills* violation

The combined impact of the jury instructions and the verdict slip used in Henry's sentencing proceeding created a "reasonable likelihood that the jury has applied the challenged instructions in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190. The Pennsylvania Supreme Court unreasonably applied the dictates of *Mills* and *Boyde* in reviewing the jury instructions and verdict slip. Therefore, I grant habeas relief to petitioner on this claim and vacate his sentence of death.

### Claim III

Henry claims that his constitutional rights were violated when his petit jury was selected from a venire comprised of an unrepresentative cross-section of the community. Specifically, he alleges that three groups were systemically excluded from

venires in Lancaster County, PA[2] at the time his trial was held: (1) Amish and Mennonites, (2) African–Americans, and (3) individuals convicted of misdemeanors and juvenile offenses. Henry claims that the exclusion of members of these three groups from the venire violated his right to a fair cross-section of the community under the Sixth Amendment. *See Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). Henry first raised his *Duren* claim in a pre-trial motion to bar selection of the petit jury from Lancaster County. The trial court held an evidentiary hearing, where it received testimony from Ronald Reedy, the District Court Administrator for the Court of Common Pleas for Lancaster County. This testimony included statements relating to each of the three groups identified by Henry in his federal habeas petition as having been excluded from the jury venire. The court denied the motion and a jury was selected from Lancaster County. Henry raised this issue again before the Pennsylvania Supreme Court on direct appeal. However, in neither his pre-trial motion nor his direct appeal did Henry include Amish and Mennonites as a group improperly excluded from the jury venire in violation of *Duren.*

As both *Taylor* and *Duren* were handed down by the United States Supreme Court before the Pennsylvania Supreme Court decided Henry's *Duren* claim on direct appeal, *see Henry I,* 569 A.2d at 933–34, they constitute "clearly established Federal law" for the purposes of federal habeas review. *See* 28 U.S.C. § 2254(d)(1). In its discussion of this claim, the Pennsylvania Supreme Court cited *Duren* as the rele-

vant legal standard and applied it to Henry's allegations that African–Americans and individuals convicted of misdemeanors and juvenile offenses were excluded from his venire. *See Henry I,* 569 A.2d at 933–34. As the Pennsylvania Supreme Court correctly identified *Duren* as the controlling legal standard and attempted to apply it to Henry's claim, "contrary to" analysis is inappropriate. The relevant question is whether the Pennsylvania Supreme Court's application of *Duren* to the facts of Henry's case was unreasonable.

 The right to the presence of a fair-cross-section of the community on the panel from which a petit jury is chosen is guaranteed by the Sixth Amendment to the Constitution. *Taylor,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690. The test for a violation of this right begins with the establishment of a prima facie case. To establish such a prima facie case, petitioner must show (1) that the community contains a distinct group, (2) that representation of that group in the venire was not fair and reasonable in relation to the number of such people in the community, and (3) that the under-representation of the group is caused by systematic exclusion. *Duren,* 439 U.S. at 364, 99 S.Ct. 664. Once a prima facie case has been established, "[t]he only remaining question is whether there is adequate justification for this infringement." *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. 664.

 With regard to the second prong of this prima facie test, the Supreme Court noted that "[i]nitially, the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth

2. Henry was charged and tried in Northampton County, PA. However, after the trial court granted his motion for a change of venire, Henry's jury was selected from a veni-

re drawn in Lancaster County, PA. *See* Opinion of Court of Common Pleas, December 22, 1986.

Amendment fair-cross-section requirement." *Duren*, 439 U.S. at 364, 99 S.Ct. 664. The defendant must also establish a "gross discrepancy" between the percentage of the excluded group appearing on jury venires and the percentage of that group in the community. *Id.* at 365–66, 99 S.Ct. 664. Two common techniques of proving such a gross discrepancy are absolute disparity and comparative disparity analysis. *United States v. Weaver*, 267 F.3d 231, 238–40 (3d Cir.2001). Absolute disparity is calculated by subtracting the percentage of the group in the venire from the percentage of the group in the relevant population, while comparative disparity is derived by dividing the absolute disparity by the percentage of the population that a particular group comprises. *See Weaver*, 267 F.3d at 238; *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3d Cir.1992) (en banc).

■ In proving the third prong of a *Duren* fair-cross-section claim, defendant must demonstrate that the underrepresentation of the excluded group is due to systematic exclusion in the jury selection process. *See Duren*, 439 U.S. at 366, 99 S.Ct. 664. It is not necessary for defendant to show intentional discrimination to establish systematic exclusion. *See id.* at 368 n. 26, 99 S.Ct. 664. An inference of systematic exclusion can arise from a "demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year," where petitioner also produces evidence of how and when in the selection process the systematic exclusion took place. *Id.* at 366, 99 S.Ct. 664.

I must determine whether the Pennsylvania Supreme Court's determination of Henry's *Mills* claim constituted an unreasonable application of these Supreme Court precedents. As the Pennsylvania Supreme Court decided Henry's claims of exclusion of each of the three groups under different prongs of the *Duren* test, I shall discuss them separately.

**A. Exclusion of Amish and Mennonites**

■ Henry asserts that Amish and Mennonites were improperly excluded from the jury venire from which his petit jury was selected. He first raised his general *Duren* claim in a pre-trial motion, leading the trial court to hold an evidentiary hearing. Among the evidence introduced at this hearing was testimony that individuals who identified themselves as Amish or Mennonite and provided a letter from their bishop were automatically excluded from the jury venire. *See* N.T. April 6, 1987, at 18–20. However, in his oral motion to bar selection of the jury in Lancaster County made at the close of this hearing, Henry's attorney did not identify the Amish and Mennonites as one of the groups being excluded from the venires. *See* N.T. April 6, 1987, at 84–88. Henry raised a similar claim on direct appeal before the Pennsylvania Supreme Court, but again failed to allege exclusion of Amish and Mennonite individuals from the venire. He also neglected to bring such a claim on PCRA review.

■ In order to "fairly present" his *Duren* claim to the state courts, Henry was required to present both the factual and legal substance of his claim. *See McCandless*, 172 F.3d at 261. Although he knew that individuals of the Amish and Mennonite faiths were excluded from his jury venire prior to his trial, Henry failed to "fairly present" this claim to either the Court of Common Pleas or the Pennsylvania Supreme Court. This claim has never been raised in the state courts and is therefore unexhausted. However, Henry cannot return to the state courts to file a successive PCRA petition on this unexhausted claim, because the one-year statute of limitations for filing such motions

has passed. *See* 42 Pa. Cons.Stat. § 9545(b)(1) (West 1998).[3] Therefore, the "futility exception" applies and the exhaustion requirement is satisfied because there is "an absence of available State corrective process." 28 U.S.C. § 2254(b). *See Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Lines,* 208 F.3d at 165–66.

■■■■■ This claim is procedurally defaulted due to Henry's failure to raise it in the state courts. *See Lines,* 208 F.3d at 166. As he possessed the factual basis for this claim before his trial began, and as he raised *Duren* claims relating to the exclusion of other groups from the jury venire, Henry cannot demonstrate that an external factor to the defense prevented his attorney from raising this claim. *See Murray,* 477 U.S. at 488, 106 S.Ct. 2639. Therefore, petitioner cannot show sufficient "cause" for this procedural default to be excused. *See id.* There is no evidence that a fundamental miscarriage of justice would occur were I not to consider the merits of this claim. Therefore, I find that Henry's *Duren* claim, with respect to the exclusion of Amish and Mennonite individuals from the jury venire, is procedurally defaulted.

### B. Exclusion of African–Americans

■■■ Henry asserts that the exclusion of African–Americans from the Lancaster County jury venire violated his right to have his petit jury "drawn from a source fairly representative of the community." *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). He initially raised this claim in a pre-trial motion. The trial court held an evidentiary hearing, where testimony from District Court Administrator Ronald Reedy established that blacks comprised approximately 2% of Lancaster County, and that the annual jury panels averaged somewhere between six and eighteen black members. *See* N.T. April 6, 1987, at 19. Using the lower estimate of six blacks in the annual venire, Henry's attorney argued to the court that the venires were 0.3% black, far lower than the percentage of blacks in the community. *See* N.T. April 6, 1987, at 85–86.

The trial court issued an opinion on April 6, 1987, finding that this evidence did not support Henry's *Duren* claim. The court recognized the *Duren* standard and noted that it was troubled by the county's heavy reliance on the voter registration list as the source for names for the jury venire. However, it found that the simple fact that the voter registration list was used, absent any inference of discriminatory practices, was not, by itself, sufficient to establish a prima facie violation of the fair cross-section requirement. It found that the numbers testified to by Reedy were not sufficient to establish such a violation, largely because the sheer numbers of blacks in the community and on the venires were so small. The Pennsylvania Supreme Court, reviewing this claim on direct appeal, also denied Henry's *Duren* claim. It cited to its past precedents for the principle that petitioner could not attack the composition of a jury venire drawn from voter registration lists on the theory that blacks are underrepresented on such lists. *See Henry I,* 569 A.2d at 933. I interpret this discussion as an application of the third prong of *Duren,* finding that Henry could not establish that

---

3. The Pennsylvania Supreme Court has held that the PCRA time limitations in § 9545(b)(1) are jurisdictional and therefore only extendable upon satisfaction of the conditions found in § 9545(b)(1)(i)–(iii) and timely filing pursuant to (b)(2). *See Commonwealth v. Fahy,* 558 Pa. 313, 737 A.2d 214, 222 (1999). Petitioner has not alleged, nor would the state courts find, that any of the three exceptions recognized in § 9545(b)(1)(i)–(iii) would apply to make a PCRA petition addressing this unexhausted claim timely.

African–Americans were systematically excluded from his jury venire.

With regard to the third prong of *Duren*, the Supreme Court held that a petitioner must demonstrate that the underrepresentation of the excluded group is due to systematic exclusion in the jury selection process. *See Duren*, 439 U.S. at 366, 99 S.Ct. 664. The Court also held that a showing of intentional discrimination is not necessary to prove systematic exclusion. *See id.* at 368 n. 26, 99 S.Ct. 664. The Third Circuit has interpreted this, in the context of venires drawn from voter registration lists, to mean that, "if the use of voter registration lists over time did have the effect of sizeably underrepresenting a particular class or group on the jury venire, then under some circumstances, 'this could constitute a violation of a defendant's fair cross-section rights under the Sixth Amendment.'" *Weaver*, 267 F.3d at 245. However, several other Courts of Appeal have held in similar circumstances that the mere fact of substantial underrepresentation on voter registration lists is insufficient direct evidence of systematic exclusion of African–Americans. *See Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir.1998); *Schanbarger v. Macy*, 77 F.3d 1424 (2d Cir.1996); *United States v. Ireland*, 62 F.3d 227, 231 (8th Cir.1995); *United States v. Ashley*, 54 F.3d 311, 314 (7th Cir.1995); *Ford v. Seabold*, 841 F.2d 677, 685 (6th Cir.1988).

The Pennsylvania Supreme Court interpreted the third prong of *Duren* to require more direct evidence of systematic exclusion than the mere fact of substantial underrepresentation of blacks on voter registrations lists. My review of this holding is limited to whether this application of *Duren* is objectively unreasonable. *See Terry Williams*, 529 U.S. at 409, 120 S.Ct. 1495. As the Pennsylvania Supreme Court's understanding of systematic exclusion is substantially identical to the interpretations of several federal Courts of Appeal, I find that it is not objectively unreasonable. Therefore, habeas relief is not merited on this claim.

## C. Exclusion of Individuals Convicted of Misdemeanors and Juvenile Offenses

 Henry also claims that his right to a fair-cross-section of the community on the jury venire was violated when individuals who had previously been convicted of misdemeanors or juvenile offenses were excluded from the venire. The Pennsylvania Supreme Court found that such individuals had been excluded from the venire, but that there was no *Duren* violation because "there is nothing of record to indicate that such persons are entitled to the protection afforded by *Duren v. Missouri*." *Henry I*, 569 A.2d at 933. Essentially, the Pennsylvania Supreme Court applied the first prong of the test enunciated in *Duren* and found that individuals convicted of juvenile offenses and minor crimes do not constitute a "distinctive group." *See Duren*, 439 U.S. at 364, 99 S.Ct. 664. I must decide whether this was an unreasonable application of *Duren*.

 While the United States Supreme Court has not clarified the meaning of "distinctive group" for the purposes of the first prong of *Duren*, several federal Courts of Appeal have interpreted this definition. The Third Circuit has noted that "the 'shared attitudes' of a given group is insufficient to qualify it as a 'distinctive group' in society for purposes of the sixth amendment." *United States v. Salamone*, 800 F.2d 1216, 1220 (3d Cir.1986) (holding that NRA members are not a distinctive group). Additionally, the Eleventh Circuit has held that a defendant must show:

(1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex); (2) that a common thread or basic

similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interests among members of the group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process

*Willis v. Zant,* 720 F.2d 1212, 1220 (11th Cir.1983).

The holdings of the Third and Eleventh Circuits require a defendant to provide some evidence of a link between group members that makes them "distinctive." This is essentially what the Pennsylvania Supreme Court required of Henry when it noted that he had failed to provide evidence that individuals convicted of juvenile offenses or misdemeanors were a distinctive group. *See Henry I,* 569 A.2d at 933 ("there is nothing of record to indicate that such persons are entitled to the protection afforded by *Duren v. Missouri*"). Reviewing the Pennsylvania Supreme Court's determination in light of these other interpretations, I cannot say that this constitutes an unreasonable application of *Duren.* Therefore, Henry is not entitled to habeas relief on this claim.

### D. Request for an Evidentiary Hearing

■ Henry requests an evidentiary hearing on his *Duren* claim, asserting that "there was a limited hearing in state court pretrial" that "did not . . . resolve critical factual issues concerning which groups qualify for protection under *Duren,* and concerning the substantial underrepresentation of African–Americans." Petition for Writ of Habeas Corpus at 64. The factual basis of Henry's claim was largely developed at the pre-trial hearing, especially with regard to the exclusion of African–Americans. Therefore, a presumption of correctness applies to those factual findings that Henry may only overcome with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Henry has not produced sufficient evidence to overcome this

presumption and therefore, an evidentiary hearing on these claims is barred.

To the extent that the factual basis of the *Duren* claims was not developed at this hearing, I conclude that it was due to Henry's lack of diligence in pursuing it. Therefore, Henry "failed" to develop the factual basis and § 2254(e)(2) applies. *See Michael Williams,* 529 U.S. at 431, 120 S.Ct. 1479. As Henry has not demonstrated that he can satisfy the high standards laid out in § 2254(e)(2), an evidentiary hearing is barred on such claims. *See id.* at 435, 120 S.Ct. 1479.

### Claim V

■ Henry claims that his retained trial psychiatrist, Dr. John O'Brien, who testified on Henry's behalf at both the guilt and penalty phases of his trial, failed to provide the effective psychiatric assistance to which Henry was entitled under *Ake v. Oklahoma,* 470 U.S. 68, 70, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Henry also claims that his trial counsel was ineffective for failing to properly prepare Dr. O'Brien, which resulted in his testimony being effectively rebutted by the Commonwealth's psychiatric experts.

For petitioner to make out a colorable federal habeas claim, he must identify the relevant "clearly established Federal law" upon which his claim depends. *See* 28 U.S.C. § 2254(d)(1). The Supreme Court has interpreted this statutory phrase to refer only to the "holdings, as opposed to the dicta, of this Court's decisions at the time of the relevant state-court decision." *Terry Williams,* 529 U.S. at 412, 120 S.Ct. 1495. Therefore, a habeas petitioner must identify the Supreme Court precedent that provides the foundation for his claim.

■ Henry suggests that *Ake v. Oklahoma* provides the clearly established Federal law necessary to his claim. In *Ake,* the Supreme Court held that,

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of

the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

470 U.S. at 83, 105 S.Ct. 1087. The Court clarified that its "concern is that the indigent defendant have access to a competent psychiatrist." *Id.* The Court grounded its recognition of this right in "the Fourteenth Amendment's due process guarantee of fundamental fairness," discussing it as one of the "basic tools of an adequate defense or appeal" which the State is required to provide to those defendants who cannot afford to pay for them. *Ake,* 470 U.S. at 76–77, 105 S.Ct. 1087 (*quoting Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971)). The Court explicitly stated that it was granting relief in *Ake* pursuant to the Due Process Clause and that it was not reaching the issue of whether the right to psychiatric assistance was guaranteed under either the Equal Protection Clause or the Sixth Amendment. *See Ake,* 470 U.S. at 87 n. 13, 105 S.Ct. 1087.

Henry's claim that Dr. O'Brien was ineffective is essentially akin to a Sixth Amendment ineffective assistance of counsel claim. He does not assert that he lacked psychiatric assistance, but that his psychiatrist failed to properly carry out his duties. However, *Ake* does not provide "clearly established Federal law" in support of such a claim. *See Clisby v. Jones,* 960 F.2d 925, 934 (11th Cir.1992) ("petitioner's claim therefore amounts to an allegation of expert incompetence akin to an ineffectiveness of counsel claim under the Sixth Amendment. *Ake,* however, exclusively relied on due process grounds and explicitly refused to consider the applica-

bility of the Sixth Amendment"); *Silagy v. Peters,* 905 F.2d 986, 1013 (7th Cir.1990) (refusing to interpret *Ake* to allow a "competence" review of psychiatric testimony, as such an inquiry was not intended by the Supreme Court). Therefore, petitioner is not entitled to habeas relief pursuant to AEDPA. *See* 28 U.S.C. § 2254(d)(1).

As Henry's *Ake* claim is meritless, his trial counsel was not ineffective for failing to raise it. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Holland,* 150 F.Supp.2d at 770; *Holloway,* 161 F.Supp.2d at 583–84. Therefore, habeas relief is not available on his claim of ineffective assistance of counsel. Petitioner requests a federal evidentiary hearing on this claim, asserting that the state court evidentiary hearing was not "full and fair" due to the exclusion of the testimony of Dr. Whyte. *See* Petition for Writ of Habeas Corpus, at 64. However, as § 2254(d)(1) precludes my consideration of Henry's *Ake* claim, an evidentiary hearing would not serve a meaningful purpose. *See Campbell,* 209 F.3d at 287. Therefore, the request for an evidentiary hearing is denied.

**Claim VI**

Henry claims that he received ineffective assistance of counsel during the voir dire stage of his trial. Specifically, he claims that his attorney was ineffective for (1) failing to question eleven of the twelve jurors about their racial attitudes, even though this was a case where defendant was black and the victim was white, (2) failing to question certain prospective jurors about prejudice against insanity and diminished capacity defenses, (3) failing to life-qualify the jury, and (4) failing to question potential jurors concerning rumors and stories about the case that allegedly circulated in the jury waiting room. The third assignment of error is moot in light of the resolution of his *Mills* claim.[4] For

---

4. Petitioner claims that, pursuant to *Ross v.* *Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101

each of the other claims, *Strickland* provides the "clearly established Federal law" required by 28 U.S.C. § 2254(d)(1). In its PCRA opinion, the Pennsylvania Supreme Court analyzed each of these claims under the "cause and prejudice" standard set out in *Strickland*. *See Henry II*, 706 A.2d at 323–25. Therefore, "contrary to" analysis is inappropriate. For each of Henry's three remaining claims of ineffective voir dire questioning, I shall examine the Pennsylvania Supreme Court's analysis to determine whether it unreasonably applied *Strickland* in denying relief.

**A. Racial Prejudice**

 Henry claims that, in light of the fact that he is a black capital defendant accused of killing a white victim, his attorney was constitutionally ineffective when he failed to question prospective jurors about any racial prejudice or bias that they might harbor against African–Americans. The Pennsylvania Supreme Court analyzed this issue under the general ineffective assistance of counsel standard of *Strickland*. *See Henry II*, 706 A.2d at 323–34. However, much of its discussion centered on *Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), a United States Supreme Court case holding that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of race bias." 476 U.S. at 36–37, 106 S.Ct. 1683. In *Turner*, the United States Supreme Court ex-

plained that, at least under a scheme where voir dire questioning is conducted by the trial judge, the form of this questioning is subject to the trial court's discretion and a defendant can only complain of the judge's failure to perform such questioning if he had specifically requested it be done. *Id.* at 37, 106 S.Ct. 1683. The *Turner* Court noted that the failure to question potential jurors about racial bias created "an unacceptable risk of racial prejudice infecting the *capital sentencing proceeding.*" 476 U.S. at 37, 106 S.Ct. 1683 (emphasis in original).

The Pennsylvania Supreme Court appears to have relied on *Turner* in analyzing whether Henry could demonstrate the requisite "cause" sufficient to merit relief for ineffective assistance under *Strickland*. It found that Henry could not establish "cause," largely due to its conclusion that the failure of petitioner's attorney to question jurors on the issue of race could have been a strategic decision. *See Henry II*, 706 A.2d at 323–24. The Pennsylvania Supreme Court additionally held that, even if Henry could satisfy the "cause" requirement, he had failed to demonstrate any prejudice from this error. *See id.* Therefore, it denied relief on this claim.

After examining the Pennsylvania Supreme Court's analysis of this claim, I conclude that it did not unreasonably apply *Strickland* with regard to the guilt phase of Henry's trial.[5] Henry asserts that his attorney's failure to question prospective

L.Ed.2d 80 (1988) and *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), he was entitled to have all prospective jurors specifically questioned whether they would automatically sentence him to death if he were convicted of first-degree murder. Henry asserts that his trial counsel was ineffective for failing to question the prospective jurors in this manner. However, any prejudice that he would be capable of demonstrating from such a violation would affect only his sentence of death, which has been vacat-

ed. *See Morgan,* 504 U.S. at 729, 112 S.Ct. 2222 ("a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence").

**5.** Henry also raised a claim of ineffective assistance of counsel at the sentencing proceeding, also stemming from this *Turner* violation. As Henry's sentence of death has been vacated, this claim is moot.

jurors about racial prejudice renders his conviction of first-degree murder unconstitutional. However, when it recognized the right to such questioning in interracial capital cases in *Turner*, the United States Supreme Court explicitly held that this error predominantly affects the sentencing phase of the trial. *See Turner*, 476 U.S. at 37, 106 S.Ct. 1683. The Court listed three factors that supported this determination, two of which are "special circumstances" present in capital sentencing proceedings but not during the guilt phase of most trials. *See id.*[6]

To successfully make out his ineffective assistance of counsel claim, Henry must establish that he suffered prejudice from the ineffective actions of his attorney during the guilt phase of his trial. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The Pennsylvania Supreme Court held that Henry could not establish such prejudice. *See Henry II*, 706 A.2d at 323–24. The explicit holding of the United States Supreme Court that *Turner* error generally affects only proceedings characterized by "special circumstances," such as a capital sentencing, suggests that the Pennsylvania Supreme Court's finding of no prejudice is objectively reasonable. Additionally, Henry has failed to offer any other evidence of prejudice he suffered at the guilt phase of his trial. Therefore, I find that the Pennsylvania Supreme Court reasonably applied *Strickland* in denying relief on this claim and habeas relief is not merited.

## B. Insanity and Diminished Capacity

Henry also claims that, as he raised defenses of insanity and diminished capacity at the guilt phase of his trial, he was entitled to have prospective jurors questioned about their attitudes on such de-

fenses and on psychiatric testimony. He claims that he received ineffective assistance of counsel when his trial attorney failed to conduct such questioning.

The Pennsylvania Supreme Court examined the record of voir dire questioning and found that ten of the twelve members of Henry's jury were specifically asked their opinions of the insanity defense, and the other two jurors were questioned on their opinions of psychiatrists and psychiatric testimony. *See Henry II*, 706 A.2d at 324. It also found that, even if counsel failed to adequately question the jurors on this issue, Henry had not demonstrated how he was prejudiced, in light of the fact that the trial judge sustained a prosecution demurrer and took the insanity defense away from the jury's consideration. *See id.*

The Pennsylvania Supreme Court resolved this claim by examining the factual record of the voir dire and the testimony of Henry's trial attorney at the PCRA evidentiary hearing. After examining this record, the court found that Henry could establish neither the cause nor the prejudice component of an ineffective assistance of counsel. *See id.* In light of both the specific evidence from the record of the voir dire proceeding that Henry's attorney questioned each juror on this issue, and the fact that the trial judge removed insanity from the consideration of the jury, I find that the Pennsylvania Supreme Court reasonably applied *Strickland* in denying this claim. Therefore, habeas relief is not available.

## Rumors in Juror Waiting Room

 Henry also claims that his attorney was ineffective for failing to question potential jury members about rumors they

---

**6.** The three factors are (1) the fact that the crime charged involved interracial violence, (2) the broad discretion given the jury at the death-penalty hearing, and (3) the special ser- iousness of the risk of improper sentencing in a capital case. *Turner*, 476 U.S. at 37, 106 S.Ct. 1683.

might have heard, after learning that some members of the jury pool were allegedly discussing the case while waiting to be called on voir dire. The Pennsylvania Supreme Court denied this claim on PCRA review, finding that the "alleged, nondescript conversation 'about the case'" did not threaten Henry's right to a fair and impartial jury, especially in light of the trial court's instruction that "the presumption of innocence operates 'to make sure that no decision is based on an initial suspicion, initial wondering.'" *Henry II,* 706 A.2d at 325. In examining the alleged conversations, the court compared them to those in *Commonwealth v. Tressler,* another Pennsylvania Supreme Court case where pre-trial remarks by jurors that they believed the defendant to be guilty were found not to deprive him of a fair and impartial jury. *See id.; Tressler,* 526 Pa. 139, 584 A.2d 930 (1990). The Pennsylvania Supreme Court then held that, as the alleged pre-trial jury room conversations at Henry's trial were harmless, petitioner's attorney could not be ineffective for failing to question jury members about them. *See id.*

The Pennsylvania Supreme Court, in analyzing the content and nature of these alleged conversations, was effectively applying the "cause" prong of *Strickland.* Absent some specific evidence that the contents of the challenged conversations was prejudicial to petitioner's right to a fair and impartial jury, a court could not assess whether a reasonable attorney would have questioned potential jurors about them. Therefore, the Pennsylvania Supreme Court required Henry to produce such evidence to proceed with this claim. *See Henry II,* 706 A.2d at 325. This is not an unreasonable application of the *Strickland* requirement that petitioner demonstrate that his attorney's performance fell well below an objective standard of reasonableness. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Therefore, habeas relief is not merited on this claim.

## Claim VII

■■■ Henry asserts that he was denied a fair trial and due process by the prosecution's presentation of false, inadmissible, unreliable and misleading testimony during both the guilt and penalty phases of trial. Specifically, he claims that the testimony of Dr. Isidore Mihalakis that the victim was held hostage and at bay, and the testimony of Dr. Dennis Asen that he could determine the mental state of the attacker from a bite mark, was false, unreliable and misleading. Henry alleges that the prosecution either knew or should have known that this testimony was false and that it knowingly utilized this false testimony to obtain both the conviction of first-degree murder and the resulting death sentence. Petitioner cites to *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) for the proposition that the Fourteenth Amendment does not allow a criminal conviction that was obtained by the knowing use of false evidence. As these Supreme Court precedents were decided prior to the consideration of this claim by the Pennsylvania Supreme Court, they constitute "clearly established Federal law" for the purposes of § 2254(d)(1).

Again, the issue is whether the Pennsylvania Supreme Court's decision was contrary to or an unreasonable application of the relevant Supreme Court precedents. *See* 28 U.S.C. § 2254(d)(1). In its PCRA opinion, the Pennsylvania Supreme Court began its discussion of this claim by citing six United States Supreme Court cases that addressed the knowing use of false testimony. *See Henry II,* 706 A.2d at 320–21. It noted that the use of such testimony was a violation of the due process clause of the Fourteenth Amendment. *See id.* The Pennsylvania Supreme Court correctly stated the rule derived from this

line of Supreme Court cases. It then applied this rule of law to the facts of Henry's case, which varied considerably from the facts in the cited Supreme Court precedents. *See id.* Therefore, "contrary to" analysis is inappropriate. *Terry Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. The remaining issue is whether the Pennsylvania Supreme Court unreasonably applied the rule of law derived from *Napue* and *Giglio* to the facts of Henry's case.

In *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), the Supreme Court held that the knowing use of perjured testimony by the State in a criminal prosecution could constitute a violation of the due process clause of the Fourteenth Amendment. The Court later extended this rule to find a violation of the Fourteenth Amendment where the prosecutor, while not soliciting the false testimony, failed to correct it even though he knew it to be false. *See Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The Court applied this rule to expert testimony relating to physical evidence, *see Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (prosecutor knowingly presented an expert who falsely identified paint on shorts as blood), and to false testimony by the prosecution that it had not offered sentencing leniency to a witness. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In each of these cases, the defendant offered evidence that the prosecution knew of the falseness of the proffered evidence in the form of affidavits and uncontroverted evidence. *See e.g., Giglio,* 405 U.S. at 152–53, 92 S.Ct. 763; *Miller,* 386 U.S. at 6, 87 S.Ct. 785; *Napue,* 360 U.S. at 266–67, 79 S.Ct. 1173.

The Pennsylvania Supreme Court cited to each of these United States Supreme Court decisions in recognizing the general rule that knowing use of false evidence is prohibited by the Fourteenth Amendment.

*See Henry II,* 706 A.2d at 320–21. Applying this rule, it found that "[t]he present case, however, does not involve the knowing use of false evidence ... simply because Henry's experts disagree with the Commonwealth's experts does not mean that the Commonwealth knowingly presented false evidence in violation of Henry's due process rights." *Id.* at 321. The evidence before the Pennsylvania Supreme Court when it decided this claim included no affidavits from either the prosecutor or the witnesses whose testimony was challenged. *See id.* ("The foundation for Henry's claim that the Commonwealth presented false evidence is the testimony of his experts ... at the PCRA hearing. These experts disputed the validity of the scientific theories on which Dr. Asen and Dr. Mihalakis based their testimony"). Henry simply presented opposing experts who criticized government's expert witnesses and the bases of their testimony. As this evidence falls far short of the affidavits of false testimony that the Supreme Court has consistently required for such claims, the Pennsylvania Supreme Court did not unreasonably apply *Napue* and *Giglio* in denying him relief. Therefore, this claim does not merit federal habeas relief.

 Petitioner requests an evidentiary hearing on this claim, asserting that the state court evidentiary hearing was not "full and fair" due to the state court's refusal to permit him to call Dr. Asen and Dr. Mihalakis at that hearing. *See* Petition for Writ of Habeas Corpus, at 65. Petitioner asserts that, at such a hearing, the testimony of these two witnesses would establish that the trial testimony of both witnesses "went well beyond anything that is accepted in their respective disciplines, and that Dr. Mihalakis consistently slants his purportedly neutral testimony in favor of the prosecution's theories." *Id.* Such testimony is substantially identical to the

evidence elicited from Henry's expert witnesses at the PCRA evidentiary hearing, which I have found insufficient to support a *Napue/Giglio* claim. Critically, Henry does not suggest that either Dr. Asen or Dr. Mihalakis would admit that he testified falsely at trial, or that the government knew of such false testimony. I find that the proffered factual basis that Henry seeks to establish through the testimony of Dr. Asen and Dr. Mihalakis has already been developed at the PCRA evidentiary hearing. Therefore, the presumption of correctness codified in 28 U.S.C. § 2254(e)(1) applies and petitioner must provide clear and convincing evidence that it is inapplicable. The conclusory statements offered by Henry do not constitute such a demonstration. Therefore, an evidentiary hearing is not warranted on this claim.

**Claim VIII**

■■■ Henry claims that his trial counsel was constitutionally ineffective for failing to challenge certain discovery violations by the Commonwealth and for failing to adequately cross-examine certain witnesses who testified for the Commonwealth. Specifically, he alleges that, with regard to three expert witnesses, Dr. Mihalakis, Dr. Asen, and coroner Joseph Reichel, the scope of their testimony went far beyond the contents of the expert reports provided by the Commonwealth, and with regard to a fourth expert witness, criminalist Thomas Jensen, that no expert report was ever provided. Henry alleges that his counsel was ineffective in failing to preclude these witnesses from testifying about issues not covered in their reports, and further, that the absence of adequate reports led counsel to conduct an ineffective cross-examination of these witnesses. Henry claims that these actions were sufficiently egregious to meet the high standard for ineffective assistance established by the Supreme Court in *Strickland.* *See supra* at 684.

*Strickland* provides the "clearly established Federal law" for this claim. *See* 28 U.S.C. § 2254(d)(1). The Pennsylvania Supreme Court dealt with this claim by finding that, for each of the witnesses, even if a violation had occurred, Henry was unable to demonstrate any prejudice sufficient to warrant relief. *See Henry II*, 706 A.2d at 326–28. As prejudice is necessary to make out an ineffective assistance claim, *see Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, it is evident that the Pennsylvania Supreme Court was applying the correct legal standard to Henry's claim. Therefore, "contrary to" analysis is inappropriate and I must analyze whether the determination of the Pennsylvania Supreme Court was an unreasonable application of *Strickland.*

To demonstrate prejudice with regard to this claim, Henry would have to demonstrate a reasonable probability that he would not have been convicted of first-degree murder, absent the testimony of these four expert witnesses.[7] *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The Pennsylvania Supreme Court ruled that Henry could not demonstrate any prejudice with regard to the testimony of these four witnesses, largely due to the fact that he did not deny causing the cuts and bitemarks at issue and only challenged the witnesses' inferences drawn from these injuries. *See Henry II*, 706 A.2d at 326–28.[8]

---

7. As Henry's sentence of death has been vacated due to *Mills* error, I examine his claim of ineffectiveness only to the extent that it infected the guilt phase of his trial.

8. Henry's briefing on this claim focuses on testimony by these four witnesses that the cuts on the victim's neck were made with a piece of glass, that the cuts were consistent with the victim being a "hostage" or "at bay," and that the bites on the victim's cheeks and breasts were "sadistic" rather than "sexual."

In light of the undisputed evidence that Henry caused the injuries and death of the victim, the Pennsylvania Supreme Court reasonably applied *Strickland* in concluding that Henry had failed to establish prejudice with regard to the guilt phase of his trial. Therefore, federal habeas relief is not merited on this claim.

Petitioner asserts that he is entitled to an evidentiary hearing on this claim due to the refusal of the Court of Common Pleas to permit him to call Dr. Asen and Dr. Mihalakis to testify at the PCRA evidentiary hearing. *See* Petition for Writ of Habeas Corpus, at 65. Henry bases this request upon identical grounds to those discussed in connection with his request for an evidentiary hearing on Claim VII. *See supra*, at 700–701. The Pennsylvania Supreme Court denied relief on this claim by applying the ineffective assistance standard enunciated in *Strickland* and finding that petitioner could not demonstrate prejudice from the testimony of any of the four challenged witnesses. Petitioner does not suggest that the testimony of Dr. Asen and Dr. Mihalakis would include any evidence of prejudice to Henry at the guilt stage of his trial. Therefore, an evidentiary hearing on this issue would not have the potential to advance Henry's claim and is not merited. *See Campbell*, 209 F.3d at 287.

## Claim IX

 Henry claims that his Sixth Amendment rights were violated by the trial testimony of Commonwealth witness Marvin Brunson ("Brunson"). Specifically, Henry alleges that Brunson was acting as a government agent when he solicited information about the crime from petitioner after being placed in the same jail cell. At trial, Brunson related several incriminating remarks that Henry allegedly made to him while they were cellmates. Follow-

ing denial of Henry's direct appeal of this issue, he was granted an evidentiary hearing by the PCRA court. At that hearing, the court heard testimony from both Brunson and Detective Gaines, the police officer to whom Brunson first reported Henry's remarks. Brunson recanted his former testimony, claiming that he made it up to curry favor with the police. The PCRA court found Brunson's recantation testimony to be unreliable and denied him relief. This ruling was affirmed by the Pennsylvania Supreme Court. *See Henry II*, 706 A.2d at 321–22.

In making this claim, Henry relies upon *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and its progeny. Each of the Supreme Court cases cited by Henry was decided before the Pennsylvania Supreme Court issued its opinion denying his claim. Therefore, they constitute "clearly established Federal law" for the purposes of 28 U.S.C. § 2254(d)(1). The Pennsylvania Supreme Court cited to *Massiah* and several of its progeny as the relevant source of law in deciding Henry's claim. *See Henry II*, 706 A.2d at 321. Therefore, "contrary to" analysis is inappropriate and I must decide whether the Pennsylvania Supreme Court unreasonably applied *Massiah* and its progeny to the facts of Henry's case.

 In *Massiah*, the Supreme Court held that the deliberate elicitation of incriminating statements from a defendant by a government agent, outside the presence of the defendant's counsel, violates the Sixth Amendment. *See* 377 U.S. at 205–06, 84 S.Ct. 1199. The Court clarified this standard in *United States v. Billy Henry*, where it noted three factors central to a *Massiah* violation: 1) the government made use of a paid informant by giving him instructions, 2) the informant

*See* Petition for Writ of Habeas Corpus, ¶¶ 133–75.

was ostensibly no more than a fellow inmate, and 3) the defendant was "in custody" at the time he made the incriminating statements. *See Billy Henry*, 447 U.S. 264, 270, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). The Court has clarified the definition of "deliberate elicitation" as including situations where the government deliberately exploits an opportunity to obtain incriminating statements, rather than affirmatively setting up such an opportunity. *See Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). However, where the informant serves merely as a passive "listening post," the deliberate elicitation prong is not satisfied. *See Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

In its PCRA opinion, the Pennsylvania Supreme Court concentrated on the "deliberate elicitation" requirement developed in *Massiah* and *Moulton*. It first noted that, at a pretrial hearing on the admissibility of Brunson's testimony, Brunson denied that he had been instructed to elicit incriminating statements from Henry by the police. *See Henry II*, 706 A.2d at 321–22. The Pennsylvania Supreme Court then discussed Brunson's recantation testimony, where he alleged that the police told him to "pump" Henry for information. As this recantation testimony was judged to be unreliable by the Court of Common Pleas, the Pennsylvania Supreme Court concluded that Henry had failed to demonstrate the merits of his *Massiah* claim. *See id.* at 321.

In denying Henry relief on his *Massiah* claim, the Pennsylvania Supreme Court did not unreasonably apply the relevant Supreme Court precedents. It is undisputed that Henry was in custody at the

time he conversed with Brunson and also that Brunson was ostensibly another inmate. Therefore, the only relevant issue under *Massiah* at the time that the Pennsylvania Supreme Court ruled on this claim was whether the incriminating statements had been deliberately elicited by Brunson. The Court of Common Pleas, on PCRA review, made a factual finding that Brunson's recantation testimony was unreliable and this finding was adopted by the Pennsylvania Supreme Court. Affording the proper deference to the factual findings of the state court, *see* 28 U.S.C. § 2254(e)(1), and considering the fact that Detective Gaines' testimony did not provide any support for Henry's claim of deliberate elicitation, I find that the Pennsylvania Supreme Court reasonably applied *Massiah* and its progeny in determining that Henry's claim was meritless. Therefore, habeas relief is barred on this claim.

**Claim X**

Henry raises several claims relating to the prosecution's closing argument and presentation of evidence at trial, and he also asserts that his trial counsel was ineffective for failing to object and present countervailing evidence.[9] As these claims rest upon different rules of federal law and were separately considered by the Pennsylvania Supreme Court, I shall address them individually.

**A. Prosecutor's Closing Argument at the Guilt Phase**

■ Henry claims that, at several points during his closing argument at the guilt phase of the trial, the prosecutor made statements that were highly inflammatory and prejudicial. Specifically, he

---

9. As I have vacated Henry's sentence of death, several of Henry's claims are moot. These include his claims relating to (1) the prosecutor allegedly introducing racial prejudice into the penalty phase of Henry's trial

and (2) references in the prosecutor's closing argument at the penalty phase comparing Henry to the Prince of Darkness, Adolf Hitler and Charles Manson.

identifies four statements that he alleges were improper. The first remark, made at the very opening of the prosecution's closing argument, was, "Finally, after a year, the Commonwealth and defense seem to agree on a few things. Yes there is a gap in this case. It is right there, between Josoph Henry's front teeth. And it was filled with the flesh of Jeanne Ann Clery." N.T. April 25, 1987 at 75. Petitioner claims that this statement was unsupported by any evidence in the record and was intended solely to inflame the jury's passions. The prosecutor made a second comment minutes later, stating:

> Now, remember, we are talking about manual strangulation. He wasn't more than a few inches from her. He looked into those eyes, and as the life drained out of them, he watched her die. Four minutes. Did he have intent to kill her? I submit to you that he did. What is four minutes like? Let's see, watch the pictures (sic) see what kind of intent there is.

N.T. April 25, 1987, at 76. Then the prosecutor stood silently looking at a clock on the courtroom wall until the four minutes had run. He then stated:

> Jeanne Ann Clery is death (sic), that is four minutes. Four minutes inches from her face, four minutes as she gasped for air, four minutes as I am sure she begged for her life, four minutes while his hands, those hands, closed around her throat.

N.T. April 25, 1987, at 77. Petitioner claims that there was no evidence in the record to support these statements and that they were simply intended to inflame the passions of the jury. Finally, Henry alleges that, on several occasions in the closing argument, the prosecutor ridiculed his defense of alcohol idiosyncratic intoxication. He claims that this attack on the only defense he had asserted was impermissible.

Though not cited by petitioner in his brief, the relevant United States Supreme Court precedent for such claims is *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). In *Darden*, the Court held that, in order to overturn a conviction or sentence for improper prosecutorial comments during summation, petitioner must demonstrate prejudice sufficient to show that the comments deprived him of a fair trial or violated the reliability of the sentencing process. *See id.* at 181, 106 S.Ct. 2464. The Supreme Court later clarified that a district court, on habeas review, must view the statements in the context of the entire proceeding, to determine whether they "so infected the trial with unfairness as to make the resulting verdict a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). The Court instructed that, even when prosecutorial remarks are markedly improper, they are not sufficient to merit reversal unless they deprived the petitioner of a fair trial. *See Darden*, 477 U.S. at 181, 106 S.Ct. 2464. These Supreme Court cases, handed down prior to the Pennsylvania Supreme Court's consideration of this claim, constitute "clearly established Federal law" for the purposes of 28 U.S.C. § 2254(d)(1).

The Pennsylvania Supreme Court did not cite to any United States Supreme Court cases in evaluating these claims. Instead, it applied a standard drawn from its own precedents:

> Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. More-

over, the prosecution, similar to the defense, is accorded reasonable latitude and may employ oratorical flair arguing its version of the case to the jury. The arguments advanced must, however, be based upon matters in evidence and/or upon any legitimate inferences that can be drawn therefrom.

*Henry II*, 706 A.2d at 330 (*quoting Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181, 1199–1200 (1996)). This standard places great emphasis on the effect that improper prosecutorial remarks have upon the fairness of the verdict. As this is also the central concern of *Darden*, I conclude that the standard used by the Pennsylvania Supreme Court to assess Henry's claim of improper prosecutorial remarks was not "contrary to" the standard laid out in *Darden*. The proper inquiry is whether the Pennsylvania Supreme Court unreasonably applied the teachings of *Darden* to Henry's claim.

In evaluating the remarks of the prosecutor at the guilt phase of Henry's trial, the Pennsylvania Supreme Court examined both the evidence supporting those remarks and their likely effect upon the jury's verdict. On direct appeal, the Pennsylvania Supreme Court upheld the trial court's ruling that, as the four minute simulation was based upon testimony, it was properly allowed by the court. *See Henry I*, 569 A.2d at 937 at n. 6. The court came to a similar conclusion on PCRA review after examining the prosecutor's reference to the gap in Henry's teeth and his comment that the victim had begged Henry for her life. *See Henry II*, 706 A.2d at 330. The court also addressed the prosecutor's reference to "this ridiculous alcohol idiosyncratic intoxication," evaluating it in the context of the other comments and finding that it was not improper. *See id.* at 330–31.

In determining that these comments did not merit relief, the Pennsylvania Supreme

Court explicitly considered the effect of the comments upon the jury's verdict. It also considered the relationship of the comments to the evidence in the record when ruling on this issue. In denying relief on these grounds, the Pennsylvania Supreme Court did not unreasonably apply *Darden*. *See United States v. Werme*, 939 F.2d 108, 117 (3d Cir.1991) ("The prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence"). Therefore, habeas relief is not merited on this claim.

■ Petitioner also raises a claim of ineffective assistance of counsel due to his trial attorney's failure to object to these prosecutorial remarks. The Pennsylvania Supreme Court correctly ruled that counsel could not be deemed ineffective for failing to raise a meritless claim or objection. *See Henry II*, 706 A.2d at 330–31; *see also Strickland*, 466 U.S. at 691, 104 S.Ct. 2052; *Holland*, 150 F.Supp.2d at 770; *Holloway*, 161 F.Supp.2d at 583–84. Therefore, habeas relief is not merited on this claim.

**B. Ineffectiveness for Failure to Call Witnesses**

■ Henry claims that his attorney was constitutionally ineffective for failing to present certain witnesses in response to testimony given by prosecution witness Marvin Brunson. Specifically, petitioner asserts that once Brunson testified that Henry was prejudiced against whites, his attorney's failure to utilize witnesses Marie Henry, petitioner's mother, and Robert Crawford, a friend of petitioner's, fell below an objective standard of reasonableness. The relevant "clearly established Federal law" for this claim is *Strickland*. *See* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

■ The Pennsylvania Supreme Court reviewed this claim on PCRA review. *See*

*Henry II,* 706 A.2d at 329. The court stated that, in order to establish ineffective assistance for failure to call a witness, petitioner must show, in addition to the general ineffectiveness standard, each of the following elements: "(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of or should have known of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the witness' testimony was so prejudicial as to have denied the defendant a fair trial." *Id.* (*citing Commonwealth v. Smith,* 544 Pa. 219, 675 A.2d 1221 (1996); *Commonwealth v. Speight,* 544 Pa. 451, 677 A.2d 317 (1996)). The court then denied relief, as Henry failed to address these additional elements in his brief. *See Henry II,* 706 A.2d at 329. The Pennsylvania Supreme Court discussed these additional elements as though they were simply a further gloss on the general *Strickland* ineffectiveness standard. *See id.* As the court recognized that *Strickland* is the guiding principle with regard to ineffectiveness claims, "contrary to" analysis is not appropriate. The remaining issue is whether the imposition of these additional requirements constitute an unreasonable application of *Strickland.*

A claim of ineffective assistance for failure to call a witness has been identified as "precisely the type of strategic decision which the Court in *Strickland* held to be protected from second-guessing." *Sanders v. Trickey,* 875 F.2d 205, 212 (8th Cir.1989); *see also, United States ex rel. Walker v. Henderson,* 492 F.2d 1311, 1314 (2nd Cir.1974). In such cases, the presumption that the attorney was effective will be especially strong. Given the high

standard for such claims to be demonstrated, the standard created by the Pennsylvania Supreme Court with the addition of these factors, does not appear, on its face, to be an unreasonable application of *Strickland.*

However, after listing these additional factors, the Pennsylvania Supreme Court found that, as Henry failed to address these additional factors in his brief, it would not address his claim of ineffective assistance. *See Henry II,* 706 A.2d at 329. This refusal to consider Henry's claim could be construed as an unreasonable application of *Strickland,* if a petitioner's failure to properly address the factors precludes consideration of an otherwise valid *Strickland* claim. However, even if the Pennsylvania Supreme Court unreasonably applied *Strickland* in refusing to consider the claim due to Henry's failure to discuss the additional factors, petitioner would not be entitled to relief. Given the strong evidence that Henry caused the victim's injuries and death and the limited nature of the testimony to which he is objecting, Henry cannot demonstrate the prejudice necessary for relief under *Strickland. See Buehl v. Vaughn,* 166 F.3d 163, 171–72 (3d Cir.1999) (finding that strong evidence against petitioner prevented sufficient demonstration of prejudice to satisfy *Strickland* ). Therefore, habeas relief is not merited on this claim.

### Claim XIII

Henry claims that he is entitled to habeas relief due to two errors by the Pennsylvania Supreme Court when it reviewed his conviction and death sentence on direct appeal. First, he claims that the Pennsylvania Supreme Court erred in reviewing the proportionality of his death sentence. As Henry's death sentence has been vacated, this claim is moot.[10] Second, Henry

---

**10.** Henry requested an evidentiary hearing on this claim. *See* Petition for Writ of Habeas

Corpus, at 65. This request is also moot.

alleges that the Pennsylvania Supreme Court conducted an improper review of his claim that the trial court erred in admitting photographs of the victim, when it failed to examine the photographs.

With regard to the photographs, Henry appears to assert two separate claims. First, he attacks the failure of the Pennsylvania Supreme Court to actually examine the photographs in reviewing his claim that they should have been excluded. Second, Henry alleges ineffective assistance of counsel due to the failure of his direct appeal attorney to ensure that the photographs were made available to the Pennsylvania Supreme Court. As the two claims rely on different legal foundations, I shall discuss them separately.

## A. Inadequate Appellate Review

■■■■ Petitioner asserts that the Pennsylvania Supreme Court was obligated to examine the photographs in question when reviewing his claim that they were unconstitutionally prejudicial and should have been excluded. As authority for this position, he cites to *Mayer v. City of Chicago*, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971). In *Mayer*, the Supreme Court held that an indigent defendant is entitled to a "record of sufficient completeness," provided free of charge. *Id.* at 194, 92 S.Ct. 410. However, the Court qualified this right, emphasizing that the defendant is not even entitled to a full verbatim transcript in all cases. *Id.* at 194–95, 92 S.Ct. 410. The *Mayer* Court's holding does not impose an obligation upon a reviewing court to examine particular exhibits in the context of direct appeal review. *Mayer* does not provide the "clearly established Federal law" necessary for federal habeas relief to be granted. *See* 28 U.S.C. § 2254(d)(1). Therefore, Henry is not entitled to habeas relief on this claim.

## B. Ineffective Assistance

Henry also asserts that J. Michael Farrell, the attorney who represented him at trial and on direct appeal, provided constitutionally ineffective assistance of counsel when he failed to ensure that these photographs were provided to the Pennsylvania Supreme Court when it reviewed Henry's direct appeal. *Strickland* provides the clearly established Federal law relevant to this claim. *See* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. As the Pennsylvania Supreme Court applied the *Strickland* "cause and prejudice" standard to Henry's ineffective assistance claim, "contrary to" analysis is not appropriate. I must therefore determine whether the Pennsylvania Supreme Court's ruling was an unreasonable application of *Strickland*.

On direct appeal, the Pennsylvania Supreme Court upheld the trial court's ruling that the photographs were properly admitted, but failed to examine the photographs in reaching this decision. Instead, the court relied upon the opinion of the trial court on this issue. *See Henry I*, 569 A.2d at 937 n. 6. In his PCRA petition, Henry again raised this issue in the context of ineffective assistance of counsel. The Pennsylvania Supreme Court found this claim to be meritless after a thorough examination of both the photographs and the trial court's ruling on their admissibility. *See Henry II*, 706 A.2d at 332–34. It found that, as the underlying claim was meritless, Henry could not bring a successful ineffectiveness claim. *See id.* at 334.

Assuming arguendo that Henry could demonstrate that his attorney failed to provide the photographs to the Pennsylvania Supreme Court on direct appeal, he cannot demonstrate any prejudice from this error, as required under *Strickland*. *See* 466 U.S. at 687, 104 S.Ct. 2052. On PCRA review, in its discussion of Henry's ineffective assistance claim, the Pennsylva-

nia Supreme Court addressed the merits of Henry's claim that the photographs were unduly prejudicial by examining those photographs. *See Henry II*, 706 A.2d at 333 ("We have reviewed all of the photographs in question and the trial court's cautionary instructions at the guilt and penalty phases, and we agree that the admission of the photographs was proper"). In light of this resolution of the claim after review of the photographs by the Pennsylvania Supreme Court, Henry cannot demonstrate a "reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Therefore, habeas relief is not merited on this claim.

### *ORDER*

**AND NOW**, this 16th day of May, 2002, upon consideration of petitioner's Petition for Writ of Habeas Corpus (Docket Entry # 11), respondents' Answer to the Habeas Petition (Docket Entry # 13), and petitioner's consolidated memorandum of law in support of his habeas petition and reply memorandum (Docket Entry # 18), it is hereby **ORDERED** that:

1. Petitioner's Petition for Writ of Habeas Corpus is **DENIED** except as to claim I, as to which the petition is **GRANTED**;

2. The execution of the writ of habeas corpus is **STAYED** for 180 days from the date of this order, during which period the Commonwealth of Pennsylvania may conduct a new sentencing hearing in a manner consistent with this opinion;

3. After 180 days, should the Commonwealth of Pennsylvania not have conducted a new sentencing hearing, the writ shall issue and the Commonwealth shall sentence petitioner to life imprisonment; and

4. There is no probable cause to issue a certificate of appealability.